16 A.3d 411 (2011)
419 N.J. Super. 88
STATE of New Jersey, Plaintiff-Respondent,
v.
Melanie McGUIRE, Defendant-Appellant.
No. A-6576-06T4.
Superior Court of New Jersey, Appellate Division.
Argued October 27, 2010.
Decided March 16, 2011.
*419 Jamie S. Kilberg (Stoel Rives LLP) of the Michigan and District of Columbia bars, admitted pro hac vice, argued the cause for appellant (Tacopina Seigel & Turano, P.C., and Mr. Kilberg, attorneys; Stephen Turano, Roseland, on the brief).
Daniel I. Bornstein, Deputy Attorney General, argued the cause for respondent (Paula T. Dow, Attorney General, attorney; Mr. Bornstein, of counsel and on the brief).
Before Judges FUENTES, ASHRAFI and NUGENT.
The opinion of the court was delivered by
ASHRAFI, J.A.D.
A jury convicted defendant Melanie McGuire of murdering her husband, desecrating his body, and two other charges. The court sentenced her to life in prison plus five years. She must serve at least sixty-six years in prison before she can be considered for parole. She appeals, arguing that her trial and sentencing were unfair. We affirm the verdict and sentence.

I.
Defendant and William "Bill" McGuire were married in 1999. They lived with their two boys in an apartment in Woodbridge. Bill worked as a computer program analyst for a college in Newark. Defendant worked as a nurse for a medical practice in Morristown. On April 28, 2004, they closed on the purchase of the first home they would own. They then returned to their Woodbridge apartment, and Bill called the gas company at 5:37 p.m. to transfer their account to the new house. At 5:44 p.m. and 5:59 p.m., he called two good friends to tell them happily he had completed the purchase of his new house.
Later that evening, Bill did not return a call from the seller of the house, as he had done promptly on prior occasions. There is no evidence that Bill ever spoke to anyone again after 6:10 p.m. on April 28, 2004, other than perhaps defendant. Bill's silence was unusual because he was normally very active on his telephones and Blackberry, both socially and for work.
On three dates from May 5 to May 16, 2004, Bill's body was found in the waters near the Chesapeake Bay Bridge-Tunnel in Virginia. The body had been cut into three sections, drained of blood, wrapped in garbage bags, and packed into three matching suitcases. The medical examiner in Virginia found two bullets in the torso, *420 and separate entrance and exit bullet wounds to the head and the chest. Also found in one of the suitcases was a blanket with markings from a hospital supply company.
Four weeks after Bill disappeared, the police notified defendant that her husband's body had been found and identified. In October 2004, New Jersey authorities took over jurisdiction of the murder investigation from Virginia. In June 2005, defendant was arrested and charged with Bill's murder.
Investigators had gathered numerous items of evidence, including: the reports of the medical examiners, grand jury testimony, witness interviews, voluntary statements of defendant to the police, statements defendant had made to friends and others, records from a gun shop in Pennsylvania, business records such as telephone and pharmacy records, surveillance tapes from business locations, expert evaluations of forensic evidence gathered from the suitcases and from Bill's car, DNA identification of trace evidence, expert examination of the personal computer owned by Bill and defendant, handwriting and linguistics analysis, consensual taping of telephone conversations, and court-authorized wiretapping of the telephones of defendant and her parents.
In addition, the State received evidence by anonymous communications pointing to persons other than defendant as Bill's murderer. The State alleged these anonymous communications were further evidence of defendant's guilt because she or someone acting on her behalf was their source.
In October 2005, a State grand jury indicted defendant on four charges: first-degree murder, N.J.S.A. 2C:11-3; second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4a; second-degree desecration of human remains, N.J.S.A. 2C:22-1; and third-degree perjury, N.J.S.A. 2C:28-1. A year later, a State grand jury returned a second indictment charging defendant in eight additional counts related to the anonymous communications received during the investigation. The court consolidated the two indictments for trial.
Defendant was tried before a jury during February through April 2007. The prosecution called sixty-four witnesses, and the defense called sixteen additional witnesses. Also, many stipulations were read to the jury, thus obviating the need to call yet more witnesses. Twenty-one witnesses who testified were qualified by the court as experts in a variety of fields and specialties. Hundreds of exhibits were admitted in evidence and displayed to the jury. After twenty-three days of testimony and about three days of deliberation, the jury convicted defendant on all four charges of the first indictment and acquitted defendant of the charges in the second indictment.
At defendant's sentencing, the court merged the weapons count with the murder charge and sentenced defendant to life imprisonment, subject to the provisions of the No Early Release Act (NERA), meaning that defendant is ineligible for parole for sixty-three years and nine months on the murder charge. See N.J.S.A. 2C:43-7.2. The court then sentenced defendant to a concurrent term of ten years for desecrating the remains of her husband, and a consecutive term of five years on the charge of perjury, with two and a half years of that sentence to be served before eligibility for parole.

II.
Arguing she did not receive a fair trial, defendant raises the following arguments on appeal:

*421 I. JURY TAINT DEPRIVED MS. McGUIRE OF A FAIR TRIAL.
A. THE JURORS WERE REPEATEDLY EXPOSED TO HIGHLY INFLAMMATORY MEDIA ACCOUNTS.
B. THE TRIAL COURT DID NOT VOIR DIRE THE JURORS PROPERLY.
C. THE TRIAL COURT FAILED TO INVESTIGATE EVIDENCE THAT JURORS MAY HAVE BEEN POSTING TO INTERNET MESSAGE BOARDS DURING DELIBERATIONS.
D. THE TRIAL COURT APPLIED THE WRONG STANDARD AND BURDEN OF PROOF.
II. PROSECUTORIAL MISCONDUCT REQUIRES REVERSAL AND REMAND
A. THE STATE'S RELIANCE ON THE ABSENCE OF EVIDENCE IT SUCCESSFULLY EXCLUDED FROM THE CASE REQUIRES REVERSAL (NOT RAISED BELOW).
B. OTHER PROSECUTORIAL MISCONDUCT CONTRIBUTED TO A FUNDAMENTALLY UNFAIR TRIAL (PORTIONS NOT RAISED BELOW).
III. THE TRIAL COURT COMMITTED NUMEROUS EVIDENTIARY ERRORS REQUIRING REVERSAL.
A. THE TRIAL COURT ERRED IN ADMITTING EXPERT TESTIMONY REGARDING GARBAGE BAGS.
B. THE TRIAL COURT ERRONEOUSLY EXCLUDED RELEVANT, ADMISSIBLE, AND EXCULPATORY EVIDENCE SUPPORTING THE DEFENSE.
C. REVERSAL IS REQUIRED.
IV. MS. McGUIRE IS ENTITLED TO RESENTENCING.
A. THE TRIAL COURT ERRED BY INVOKING POST-MURDER CONDUCT TO AGGRAVATE THE MURDER CHARGE (NOT RAISED BELOW).
B. THE COURT ERRONEOUSLY REFUSED TO CONSIDER A MITIGATING FACTOR.
Pursuant to Rule 2:10-2, the plain error standard of review applies to some of defendant's arguments that were not raised in the trial court. Under that standard, a conviction will be reversed only if the error was "clearly capable of producing an unjust result," ibid.; if it was "`sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached[.]'" State v. Taffaro, 195 N.J. 442, 454, 950 A.2d 860 (2008) (quoting State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971)). Defendant must prove that a plain error was clear and obvious and that it affected her substantial rights. State v. Chew, 150 N.J. 30, 82, 695 A.2d 1301 (1997), cert. denied, 528 U.S. 1052, 120 S.Ct. 593, 145 L.Ed.2d 493 (1999), overruled in part on other grounds by State v. Boretsky, 186 N.J. 271, 284, 894 A.2d 659 (2006).
Other points defendant raises on appeal will also require that we determine whether any error shown was nevertheless harmless in the context of the entire trial. Macon, supra, 57 N.J. at 338, 273 A.2d 1. An appellate court will disregard "[a]ny error or omission ... unless it is of such a nature as to have been clearly capable of producing an unjust result." State v. Castagna, 187 N.J. 293, 312, 901 A.2d 363 (2006).
*422 To aid our assessment of plain and harmless error, we will review in detail the evidence presented at the trial.

III.
The State alleged that defendant wanted to end her marriage to Bill but also had concerns about divorce. She wished to avoid purchasing a house at substantial expense and beginning a new phase in a marriage she regretted. In April 2004, defendant conducted internet research to learn about buying a gun and about poisons, sedative drugs, and murder. She also made inquiries of a friend about how to buy a gun. In the evening hours of April 28, 2004, after the closing on the new house, she allegedly drugged and incapacitated Bill and then shot him sometime during April 28-29.
During the next three days, according to the State, and likely with the help of an accomplice as yet unidentified, defendant caused Bill's body to be cut into sections with a reciprocating saw and a knife, wrapped the body in industrial-type garbage bags sealed with adhesive tape, and packed it into the matching set of luggage. She then drove to Virginia on May 3, where the suitcases were thrown at night from an isolated stretch of the Chesapeake Bay Bridge into the bay. Immediately after murdering Bill, according to the State, defendant embarked on a plan to conceal the crimes and to create the appearance that Bill had abandoned his family, his job, and his new house after a violent argument with her.
The State had no eyewitnesses to the murder and disposing of Bill's body. Also, police investigators found no trace evidence of a murder or dismembering of a body at the Woodbridge apartment, despite several intense searches and forensic examinations beginning in June 2004, a month after the murder. The State's wiretapping of telephones almost a year later failed to produce notably incriminating statements by defendant or others. To prove its case at trial, the State relied largely on forensic and other circumstantial evidence of defendant's motive and actions during the relevant time period.
As to motive, the State presented evidence that at the time of Bill's disappearance, defendant was involved in an intense, extra-marital love affair with Dr. Bradley Miller, a partner in the medical practice where she worked. Miller was also married and had young children. According to Miller's testimony, the intimate relationship began in 2002. In time, he and defendant spoke about getting married, buying a house, and having children, although they had no immediate plans to divorce their spouses. Defendant told Miller that Bill had once threatened to take their sons and disappear if she were to file for divorce. A nurse who worked alongside defendant and was her friend testified she had discussed the high costs of her own divorce with defendant in the months preceding Bill's disappearance.
Shortly after Bill disappeared, defendant told Miller, friends, and others that Bill argued with her in the early morning hours of April 29, 2004, and that, for the first time in their relationship, he struck her. She said he then left the apartment abruptly. During the day on April 29, defendant spoke to attorneys about filing for divorce, and she went to the Middlesex County Courthouse to apply for a domestic violence restraining order. She abandoned the effort that day because the court was crowded. That night, she checked into the Red Roof Inn in Edison, paying for her room in cash. The same night, defendant drove to Atlantic City.
On June 2, 2004, in her first interview with a Virginia Beach police detective, defendant *423 said Bill had assaulted her in the early morning hours of April 29, and she had hidden in a bathroom of the Woodbridge apartment with one of their sons. She heard Bill rummaging through the apartment before he left in the middle of the night, saying she would never see him again. Defendant also told the Virginia detective that Bill was in the habit of saying things that angered people, and that he frequently gambled in Atlantic City. She suggested the police might find him or his car there. She did not tell the detective she had already traveled to Atlantic City five weeks earlier, and she had parked Bill's car in a motel parking lot there.
The detective asked defendant whether Bill used EZ Pass, the automatic toll collection system available on the Garden State Parkway, the Atlantic City Expressway, and other eastern toll roads. Defendant said that Bill had an EZ Pass account but did not always use it. Two days after the interview, the police found Bill's Nissan Maxima at a tow yard in Atlantic City. Soon afterward, news reports surfaced that Bill's car had been found and police had surveillance film of the person who had parked it at the Flamingo Motel in Atlantic City.
After those news reports, defendant told Dr. Miller she had driven to Atlantic City late on the night of April 29 to look for Bill and his car. She said she found the car in the parking lot of the Taj Mahal Casino. As a gesture of spite, she moved Bill's car to the Flamingo Motel, which was about one and a half miles away. She told Miller she then took a cab back to the Woodbridge-Edison area because she was tired. Having slept during the ride, she decided to take another cab back to Atlantic City to retrieve her own car, a Nissan Pathfinder. Defendant also told Miller she made two later trips to Atlantic City to look for Bill and to check on the car, on May 2 and 18, 2004. Some months later, after Miller had revealed defendant's statements to the police, a detective checked with cab companies in the Woodbridge-Edison area and found no record of a fare on April 30, 2004, to Atlantic City.
Several hours after returning north from her first trip to Atlantic City, during the afternoon of April 30, 2004, defendant went again to the Middlesex County Courthouse and this time testified before a judge to obtain a temporary restraining order against Bill. Despite having moved his car just hours earlier, she testified she did not know where Bill could be found.[1]
At the trial in 2007, the prosecution presented evidence to show that defendant had plotted to kill her husband for weeks before his disappearance. A State Police computer expert, Jennifer Seymour, testified that she examined computers and hand-held devices that the McGuires had used, including a personal desktop computer they used in their apartment. On that personal computer, Seymour found that internet Google searches had been conducted between April 11 and 26, 2004, for the following topics: "undetectable poisons," "state gun laws," "instant poison," "gun laws in Pennsylvania," "toxic insulin levels," "fatal insulin doses," "fatal digoxin doses," "instant undetectable poisons," "how to commit suicide," "how to commit murder," "how to purchase hunting rifles in NJ," "pesticide as poison," "insulin as a poison," "morphine poisoning," "how to find chloroform," "insulin shock," "neuromuscular blocking agents," "sedatives," *424 "tranquilizers," "barbiturates," "nembutal," "pharmacy," "chloral hydrate," "chloral and side effects," and "Walgreens." The search for "chloral hydrate" stood out because the police had found that drug in Bill's car. Also, the references to gun laws were reinforced by testimony from a long-time friend of defendant.
James Finn, who had attended nursing school with defendant, testified about his long-standing but unreturned romantic interest in defendant. The two had remained friends over the years and stayed in contact. As shown by emails admitted in evidence, defendant wrote to Finn in mid-April 2004 about problems she was having in her marriage, and she joked about his owning a gun. She said Bill was acting strangely and was drinking more; she was afraid for her safety. In response, Finn spoke to her about the requirements for buying a gun in New Jersey and Pennsylvania.
On April 26, 2004, two days before Bill's disappearance, defendant bought a Taurus.38 caliber revolver at a gun shop in Palmer Township, Pennsylvania. As identification, she used her own Pennsylvania-issued driver's license, which contained her aunt's address in East Stroudsburg, Pennsylvania. The sales receipt from the gun shop also showed an item sold for $9.95. The owner of the gun shop testified that two types of ammunition in the shop were listed for that price, wad-cutter and round-nose Ultramax bullets. He recalled the sale of a handgun and ammunition to defendant because she was a well-dressed woman and because she was the first nurse who had bought a handgun from him.
After buying the gun, defendant continued to communicate by email with Finn but did not tell him she had bought a gun. About a year after Bill's murder, Finn allowed a telephone conversation with defendant to be recorded by police detectives. At that time, defendant told Finn that Bill had asked her to buy a gun for protection in their new home. She said Bill could not buy a gun himself because he had been convicted of a crime in the past. In correspondence with Finn before Bill's disappearance, defendant had not said Bill wanted a gun. In fact, their email communications indicated that Finn was concerned for defendant's safety in Bill's presence, and his advice was for her to buy a gun to protect herself against him. After Bill's murder was discovered, defendant also told Dr. Miller and other friends that Bill had asked her to buy a gun for him because he could not buy one himself.
The gun was never found. In filling out an information sheet when applying for the domestic violence restraining order on April 29, 2004, defendant had answered "no" to a question about whether Bill had a gun or there were guns in her house. Defendant later told Miller and others that she believed Bill had locked the gun in a box, which she had put away in storage. During their investigation, the police searched the storage area with defendant's permission and found a locked box. Inside the box, they found batteries, not a gun.
The State's forensic experts testified that the bullets recovered from Bill's body were .38 caliber wad-cutter bullets. Based on ballistics markings, they could have been fired from guns produced by six or more manufacturers, including Taurus.
One of the bullets recovered from the body was covered with greenish-brown fiber strands. Thomas Lesniak, a forensic scientist employed by the New Jersey State Police, testified that the fibers were polyester fill, material that might be found in furniture. The State argued that the fiber strands were evidence that the sound of gunfire that killed Bill had been muffled, *425 possibly by covering the gun with a pillow. Lesniak could not positively match the fibers on the bullet with a green couch or throw pillows that the McGuires had kept in their apartment. Later in the trial, Bill's sister, Cindy Ligosh, testified that the McGuires also had other green throw pillows that had not been recovered by investigators.
In Atlantic City, the police recovered time-lapse surveillance film made at the Flamingo Motel. The grainy film was not clear enough to identify the person who had parked Bill's Nissan Maxima. It showed, however, the time that the car had been parked at the motel, 12:40 a.m. on April 30, 2004. It also showed a second car with features in some ways similar to defendant's Nissan Pathfinder that was also moving and stopped briefly near the motel at that same time.
During the police investigation, defendant was mistakenly under the impression that surveillance cameras had also filmed her on the Delaware Memorial Bridge at the southern tip of the New Jersey Turnpike. She told Dr. Miller she had traveled to Delaware on May 4, 2004, to shop for furniture.
Although both defendant's Pathfinder and Bill's Maxima were equipped with EZ Pass transponders, the police found no EZ Pass record of either car traveling in the area of Atlantic City on April 29-30, 2004, or to Delaware and the Chesapeake Bay Bridge-Tunnel in early May 2004.
When the police found Bill's Maxima on June 4, 2004, they dusted the car for fingerprints but could lift only Bill's own latent prints from inside the car. On the passenger seat, the police found Bill's cell phone and pamphlets for Atlantic City and Virginia Beach hotels. Inside the glove compartment, they found a syringe similar to ones used at the Morristown medical practice where defendant worked and a prescription bottle of chloral hydrate, which is a rarely-prescribed liquid sedative.
The prescription was in the name of a woman who was a patient of Dr. Miller at the Morristown medical practice. It had been filled at 8:32 a.m. on April 28, 2004, the date of Bill's disappearance, at a Walgreens pharmacy in Edison. The McGuires' computer indicated an internet search for "Walgreens" close to the same date. Records from the McGuire children's daycare facility showed that defendant had dropped off her sons there at 8:20 a.m. on April 28, 2004. The Walgreens pharmacy in Edison is 1.5 miles, or a drive of about eight minutes, from the children's daycare facility.
Evidence from the pharmacy showed that the prescription had been ordered by Dr. Miller on a prescription pad from the Morristown medical practice. Miller denied having written the prescription, and a handwriting expert testified that the writing was not his. The expert could neither identify the signature as one written by defendant nor exclude her as the writer. The managing partner at the medical practice testified that he and other doctors in his practice were unlikely to prescribe chloral hydrate for their patients. He also testified that nurses were permitted to sign prescriptions, and that it was not unusual for defendant to have signed Miller's name.
The patient whose name was on the prescription testified that she had appointments with Dr. Miller in March and April 2004, but she never received a prescription for chloral hydrate, and she had never been to the Walgreens pharmacy in Edison. She testified the written prescription showed her correct date of birth and a telephone number that was off by one digit from her telephone number.
*426 The State alleged that defendant forged and obtained the prescription after dropping off her children at daycare on the morning of April 28. Sometime that night, she allegedly sedated Bill by pouring the liquid chloral hydrate into a drink, and she shot him while he was unconscious, using a pillow or something similar to muffle the sound of gunfire.
According to the State, defendant immediately began covering up the murder by creating evidence that Bill had abruptly abandoned his home, as she believed he had done to end his first marriage. In the early morning of April 29, an email was sent from Bill's Blackberry to two of his supervisors stating "I will be out sick today." Bill's Blackberry was later found in the trunk of his Maxima in Atlantic City. It indicated that one of the emails sent to a supervisor had not been delivered. According to a co-worker of Bill, the email was sent to an incorrect address and Bill knew the correct one.
The State also contended that on the afternoon of April 30, 2004, defendant used Bill's cell phone to place a call to his best friend in Virginia, as shown by Bill's cell phone records. The friend testified that he did not receive a call from Bill on that date. He testified further that Bill had always left a message on the answering machine, but no message was left on April 30. The prosecution alleged that defendant made the one-minute call and hung up only to create an appearance that Bill was still alive on that date.
The State also alleged that defendant took a second trip to Atlantic City during the night on May 1-2, 2004, allegedly with her stepfather, Michael Cappararo. Her purpose was to check on Bill's car and also to create additional false evidence suggesting that Bill was still alive and staying in the Atlantic City area. In May and June 2004, defendant told Bill's sister and the Virginia homicide detective that the caller i.d. feature on her apartment telephone showed a call from Bill's cell phone to the apartment in the middle of the night on May 2, but no message had been left. In fact, Bill's cell phone records showed a one-minute call at 1:10 a.m. on May 2 to the Woodbridge apartment. EZ Pass records, however, identified the transponder kept in defendant's Pathfinder passing a toll plaza on the Atlantic City Expressway at 12:54 a.m. on May 2, just sixteen minutes before the call from Bill's cell phone. Bill's cell phone was later found in his Maxima.
On June 3, 2004, one day after the Virginia detective had asked defendant about EZ Pass records, defendant called customer service at EZ Pass and insisted that two charges on her account for May 2 and 18 near Atlantic City were incorrect. Customer service refused to remove the charges. The State alleged that, in her travels to Atlantic City and Virginia, defendant had purposely paid tolls in cash because she knew using EZ Pass would create records of her trips. In support of that allegation, the State noted that no other EZ Pass records were found for travel to Atlantic City, although Bill's car obviously was driven from Woodbridge to Atlantic City on April 29, and defendant told Miller she had driven her own car back and forth to Atlantic City on April 29-30, and also that she had traveled to Delaware on May 4. Theorizing that the EZ Pass records for May 2 and 18, 2004, were created when defendant drove through a toll booth that accepted both cash and EZ Pass, the State alleged that defendant complained to customer service about two forty-five-cent toll charges because she was upset that a record of her travels existed despite her efforts to conceal them.
*427 To answer the prosecution's allegations, the defense presented evidence of other occasions when Bill had apparently been in Atlantic City without corresponding EZ Pass records. Regarding the customer service call, the defense argued to the jury that defendant had panicked after the Virginia detective asked about EZ Pass records because she did not want to be falsely implicated in Bill's murder.
The State also placed in evidence EZ Pass records of defendant's parents, who lived in Ocean County and traveled frequently on the Garden State Parkway. Those records showed unusual absence of activity from April 28 through May 2, the period when defendant had traveled twice to Atlantic City and Bill's body was allegedly being cut and packaged in suitcases.
The State argued that EZ Pass records that existed for defendant and her parents on the afternoon of May 3 suggested they had met, and then each had returned in their earlier directions. Based on the times and locations of the tolls registered, and records from the children's daycare facility, the State argued that defendant had picked up her sons from daycare on the afternoon of May 3 and transferred them to one or both of her parents' care, possibly at the Cheesequake rest area of the Garden State Parkway in Middlesex County. Then, according to the prosecution, defendant had returned to Woodbridge to pick up the suitcases for the trip to Delaware and Virginia that night to dump the body.
The State also theorized that defendant planted the prescription bottle of chloral hydrate and a syringe in Bill's car to create the appearance that he was abusing drugs, as she had told friends, and in case the body was recovered and chloral hydrate was detected. Bill's autopsy and toxicology reports, however, revealed no evidence of drugs in his body.[2]
The State argued further that brochures for Atlantic City and Virginia Beach hotels were placed on the front seat of Bill's car to create an appearance that he was staying in hotels. The prosecution argued that Bill was very familiar with both Atlantic City and Virginia Beach and cited evidence that Bill had compensation offers from the Taj Mahal Casino that he could have used to pay for a room but did not.
Immediately upon finding Bill's car, the police vacuumed the interior for trace evidence. Among the debris from the front floor mats, the State's expert, Lesniak, found very small particles of human tissue. DNA testing of the tissue matched it with Bill's DNA. Dr. Zhongue Hue, the State's Regional Medical Examiner, identified the particles as skin with associated fibrous connective tissue. He testified that the deep layers of skin in that tissue would not normally be shed by a live human being. While it was possible that the tissue might be lost as the result of a cut or gouge, such an injury would cause significant bleeding and scarring, but the Virginia medical examiner had observed no scars on Bill's body.
The State asserted that the human tissue particles found on the floor mats were evidence that defendant had been involved in the cutting up of Bill's body. It argued that defendant, or her accomplice, had driven the Maxima to Atlantic City and had later entered it again on May 2 to plant evidence. In the course of those *428 activities, according to the prosecution, defendant or her accomplice had transferred on their shoes miniscule particles of Bill's tissue that had been inadvertently scattered at the location where the body had been cut into sections with a saw and a knife.
The State argued it did not have to prove where the body had been dismembered, but it was most likely in the Woodbridge apartment. In support of that contention, the State noted that defendant took a room and slept at the Red Roof Inn from April 29 to May 1, although she could presumably have stayed in her apartment, or with her children in her parents' Ocean County home. The prosecution argued that defendant did neither because Bill's body was in the apartment, and she needed to remain close to Woodbridge while engaged in the task of disposing of the body and eliminating evidence from the apartment. Citing records from the Red Roof Inn and defendant's telephone, the prosecution argued that defendant had the opportunity to spend many daytime hours from April 29 to May 1 in the apartment.[3]
To establish the connection between the Woodbridge apartment and Bill's murder, the State emphasized expert examinations of evidence found in the suitcases thrown into the Chesapeake Bay and related circumstantial evidence. When first interviewed by the Virginia detective, defendant had said she and Bill did not own matching luggage. The next day, she had remembered a set of luggage they owned and identified a picture of a suitcase shown by the detective as resembling their matching set. A ten-inch hair had been found in one of the suitcases and was identified by DNA analysis as possibly coming from defendant.
The Virginia detective testified that when he examined Bill's Maxima in the Atlantic City tow yard, it was his opinion that the three suitcases would not have fit in the trunk, and there were two child seats fastened in the back seat. This testimony was intended to refute the defense contention that Bill had packed three suitcases on the night of his disappearance and driven off to Atlantic City, only to be murdered by an unknown person at a later time.
The prosecution also noted that Bill had not taken his wallet on his alleged flight. The police found the wallet in storage utilized by defendant after she moved from the apartment. Although Bill's driver's license and credit cards were not in the wallet, it contained two recently-obtained business cards, tending to show that Bill had been using the wallet as of April 2004.
Inside the suitcases, Bill's body had been wrapped in garbage bags sealed with adhesive tape. Those items were crucial evidence used by the prosecution at the trial. When moving out of the Woodbridge apartment at the end of May 2004, defendant had gathered Bill's clothing for disposal in several industrial-type garbage bags. An acquaintance who was helping defendant move her belongings kept the bags of Bill's clothing. Later, the police recovered from the acquaintance the garbage bags he had taken.
State experts compared the garbage bags taken from the Woodbridge apartment to the garbage bags found in the suitcases. Frank Ruiz was qualified by the trial court as an expert witness in *429 plastic bag technology and manufacturing by virtue of his twenty-seven years of experience in the plastic bag industry and his degree in chemistry. Ruiz testified that the two sets of garbage bags were produced on the same production line and within hours of each other. State Police forensic scientist Lesniak also examined the garbage bags. He testified as a tool mark expert that the two sets of bags contained markings revealing that they were produced with the same tools and therefore on the same extrusion line. Using the testimony of these two expert witnesses, the State asserted that the garbage bags the killer used to wrap the body in early May 2004 came from the same source as those that defendant used to pack Bill's clothes later in May.
Defendant presented testimony from Sally Ginter, a polymer chemist and the owner of a consulting company who had contacted the defense team after learning on television about Ruiz's testimony at the trial. Ginter disputed Ruiz's conclusions and testified for the defense that the proper interpretation of Ruiz's test results was that the garbage bags from the apartment did not match those from the suitcases.
From adhesive tape inside the suitcases, the State recovered a particle of red nail polish and some small hairs. Through microscopic examination, the State's expert described the hairs as being cut at both ends, like shaving stubble. One of the hairs was identified with Bill's DNA and one with defendant's DNA. The State argued to the jury that these small cut hairs were evidence that Bill's body was cut and wrapped in a bathroom of the McGuire apartment, where such shaving stubble might have inadvertently found its way onto the adhesive tape used to wrap the body.
In one of the suitcases, a blanket had been wrapped around the torso's head. The blanket was imprinted with the initials "HCSC," a company that supplied linens to about one hundred hospitals and doctors' offices in New Jersey. An account representative from HCSC recognized the blanket as one of the company's products, and further testified that the medical practice in Morristown where defendant worked had been his client since 2001. In April 2004, he was shipping approximately one hundred such blankets per week to that facility.
After defendant was charged with Bill's murder in June 2005, and then released on bail, law enforcement authorities received anonymous communications directing them to persons other than defendant. In August 2005, copies of a single-spaced, four-page letter were sent to a newspaper, defendant's former attorney, and others. Addressed to the Attorney General of New Jersey, the anonymous letter was purportedly typed by someone with a criminal inclination who was concerned about defendant's children being left without a mother. The writer claimed to have killed "Billy Mac" because he had become unreliable and greedy. To prove that the letter was not a hoax, the writer accurately recited three evidential facts about the murder and the cutting of the body that had not been reported in the news. The prosecution read the entire letter to the jury, including its detailed information about Bill's thoughts and his mistreatment of defendant. Bill had allegedly revealed this information during his criminal contacts with the confessing, anonymous killer.
On October 11, 2005, a Federal Express package was delivered to the prosecutor. The package contained a letter to "Dear Madam Assistant Attorney General," purportedly from an anonymous co-worker of Bill's sister, Cindy Ligosh, at the Weichert Realty office in Franklin Lakes. The writer enclosed several items that were *430 allegedly found in the trash at her office, including a wedding ring and bracelet believed to belong to Bill, an empty Ultramax ammunition box, a key to Bill's Nissan Maxima, a key to the lock box found in the storage facility, rubber gloves, prescription medications, and marijuana wrapped in tinfoil. The package also contained allegedly discarded sheets of notepaper with writing that the anonymous sender identified as Ligosh's handwriting.[4]
The return address on the Federal Express package was Weichert Realty, on Franklin Road, Franklin Lakes, New Jersey. The Weichert office manager, Tamar Joffee, testified that the correct address for her office was Franklin Avenue, not Franklin Road. She also testified that the wrong telephone number was listed on the letterhead, that the Weichert logo was a forgery, and that the office did not use Federal Express at that time.
Shipping charges for the Federal Express package were paid with a $50 American Express gift card, which was purchased at 3:48 p.m. on October 9, 2005, at a Rite Aid Pharmacy in Passaic. Surveillance film footage from a bank near that pharmacy showed that at 3:42 p.m. on that date, a woman walked from the parking lot into the Rite Aid Pharmacy. The film footage was shown to the jury, each side at trial contending that the woman shown did or did not resemble defendant.
The State presented testimony from James Fitzgerald, an expert in forensic linguistics, who examined and compared known writing samples from defendant with the single-spaced August letter to the Attorney General and the Federal Express documents. Fitzgerald pointed out several similarities between the known samples and the anonymous documents. He also found the salutation "Dear Madam Assistant Attorney General" to be significant and compared it to a recorded telephone conversation in which defendant referred to the prosecutor as "Madam Deputy Attorney General."
The defense presented the testimony of linguistics expert Carole Chaski, who disputed Fitzgerald's findings and testified about differences in the known and anonymous writings. Chaski concluded that defendant could not be identified as the writer of the anonymous communications.[5]
In addition to its own experts and character witnesses, the defense vigorously cross-examined the State's witnesses and contended that none of the evidence proved defendant murdered her husband or cut up his body. The defense emphasized the absence of any forensic evidence in the Woodbridge apartment that would have shown several gunshots being fired *431 or a body being cut with a power saw. It asserted that neither neighbors nor anyone else had heard or seen anything connected with a shooting or cutting up of a body.
The defense also relied heavily on the absence of incriminating statements by defendant in the wiretap and consensual recordings detectives obtained during the course of their investigation. The defense argued defendant had bought a handgun on April 26 at Bill's urging because Bill could not buy a gun himself. The defense contended that from the time the investigation was moved from Virginia to New Jersey, the police focused solely on defendant and that numerous leads concerning Bill's gambling, alleged substance abuse, and alleged association with criminals were not pursued.

IV.
On appeal, defendant challenges evidentiary rulings of the trial court. She argues error in the admission of opinion testimony by the two State experts, Ruiz and Lesniak, who compared and matched the garbage bags. She also argues the trial court erred in limiting defense evidence.
Many types of evidentiary rulings by a trial court are entitled to deference and will not be disturbed on appeal unless there was a clear abuse of the trial court's discretion. See Estate of Hanges v. Met. Prop. & Cas. Ins. Co., 202 N.J. 369, 382, 997 A.2d 954 (2010) (citing cases under several rules of evidence applying the abuse of discretion standard of review to the trial court's rulings). The admission of expert testimony, however, may involve both the abuse of discretion and the plenary standards of review. The qualifications of an expert and the admissibility of opinion or similar expert testimony are matters left to the discretion of the trial court. State v. Torres, 183 N.J. 554, 572, 874 A.2d 1084 (2005); State v. Summers, 176 N.J. 306, 312, 823 A.2d 15 (2003). But appellate deference is not required on the question of whether a particular field or scientific discipline is sufficiently reliable and generally accepted in the relevant professional or scientific community. State v. Harvey, 151 N.J. 117, 167, 699 A.2d 596 (1997), cert. denied, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000). An appellate court may independently review scientific literature, judicial decisions, and other authorities to determine whether proposed expert testimony is scientifically reliable and has obtained general acceptance so that it may be admitted in our courts. Torres, supra, 183 N.J. at 567, 874 A.2d 1084.

A.

1.
The State alleged that the garbage bags defendant used to dispose of Bill's clothing in late May came from the same source as those used to wrap Bill's severed body a few weeks earlier. The match tended to connect the Woodbridge apartment to desecration of the body, and hence, defendant's involvement in both the desecration and the murder. Before the trial began, the court held lengthy hearings pursuant to N.J.R.E. 104 to determine the admissibility of Ruiz's and Lesniak's testimony.
Ruiz testified he had a bachelor's degree in chemistry from the Massachusetts Institute of Technology and was employed as Technical Director at a plastic bag manufacturing company. He had twenty-seven years of experience in the plastic bag industry, including extensive activity on boards and associations. He had published papers on the technology of plastic film extrusion. He had previously been qualified twice to testify in courts as an expert *432 in plastic bag manufacturing and identification.
Ruiz provided detailed testimony about how plastic garbage bags are manufactured and the materials and machinery used in the process. He testified that die lines, or striations, which are lines along the length of a bag, are caused in the manufacturing process by build-up of impurities on the lip of the die through which the polymer material must pass. Die lines may have distinct shapes, widths, spacing, and opacity. The patterns will change in a matter of hours as material accumulates on the die.
For purposes of his expert evaluation in this case, Ruiz visually inspected the two sets of garbage bags and determined they were identical in design, size, thickness, color, and sealing characteristics. He explained potential reasons for slight color and opacity variation in the two sets of bags. Most important to his conclusions, he determined that the die lines between the two sets were a match, indicating a single manufacturing process.
To supplement his findings, Ruiz conducted tests in his company's laboratory to determine the chemical composition of the two sets of bags. An infrared spectroscopy analysis indicated that the raw materials used for the two sets of bags were identical. A test called differential scanning calorimetry measured the temperature at which the polyethylene in the bags melted. Tests on one bag from the suitcases and one bag from the apartment yielded consistent results, demonstrating that both specimens had the same crystalline structure. This result was significant because resins will have different melting points depending on their original manufacturers.
Ruiz also performed an ash test to burn away the polyethylene and compare the inorganic materials added in the manufacturing process. The ash test showed similar, although not identical, inorganic materials in each set. Ruiz explained the reasons for the results of the ash test and concluded that the differences were not significant.
Ruiz testified that all the bags were made of linear low density polyethylene that had been manufactured from reprocessed scrap film plastic, and thus they contained more peculiar identifying characteristics than bags manufactured from virgin polyethylene material. He concluded that both sets of bags were manufactured from the same box of reprocessed plastic material.
Ruiz also explained that die lines will vary more rapidly when reprocessed material is used because contaminants are present and accumulate on the surface of the die. At some point, the accumulation will affect the quality of the bags and the manufacturing line must be shut down so the die can be cleaned. In Ruiz's plant, the die was typically cleaned every four or fewer hours. An identical marking pattern on the two sets of bags shows the bags were manufactured using the same die and within hours of one another. Based on all his test results, Ruiz concluded that all the bags were made from the same batch of reprocessed material in a single production run.
Under N.J.R.E. 702, the proponent of expert testimony must establish three basic foundational requirements: "(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony." Hisenaj v. Kuehner, 194 N.J. 6, 15, 942 A.2d 769 (2008). "Those requirements are *433 construed liberally in light of Rule 702's tilt in favor of the admissibility of expert testimony." State v. Jenewicz, 193 N.J. 440, 454, 940 A.2d 269 (2008).
In arguing against admission of Ruiz's testimony, defendant does not challenge any of the three listed criteria for admission of expert testimony. Rather, she contends that Ruiz failed to follow proper testing protocols, such as using a control set of bags to test the accuracy of his results, and he did not conduct yet additional chemical tests.
To challenge Ruiz's conclusions, the defense presented the testimony of its own expert, Sally Ginter, who also had a degree in chemistry and had previously been employed at Dow Chemical Company. Ginter testified that Ruiz had not conducted all the tests necessary to match the bags, and that the tests he performed showed significant differences between the two sets. On cross-examination, however, Ginter acknowledged she had no experience with the manufacturing process of garbage bags. She also admitted that part of her analysis and criticism of Ruiz resulted in her concluding that two garbage bags that were both taken from the suitcases also were not a chemical match.
Defendant's arguments against Ruiz's methodology and conclusions might have affected the credibility and weight of his testimony, but not its admissibility. See State v. Noel, 157 N.J. 141, 146-47, 723 A.2d 602 (1999); see also United States v. Davis, 103 F.3d 660, 674 (8th Cir.1996) (cross-examination and presentation of contrary evidence are the appropriate means of attacking expert testimony that is otherwise admissible), cert. denied, 520 U.S. 1258, 117 S.Ct. 2424, 138 L.Ed.2d 187 (1997). The trial court committed no error in admitting Ruiz's expert testimony about the two sets of garbage bags.

2.
Defendant argues more vigorously that Lesniak was erroneously permitted to testify as an expert in tool mark analysis and to conclude that the two sets of bags were a match. She argues that Lesniak was not qualified to testify about manufacturing of plastic bags and that his tool mark analysis was inadmissible "junk science."
At the pretrial hearing, Lesniak testified he had worked as a forensic scientist in the New Jersey State Police Office of Forensic Sciences since 1980. He had a bachelor's degree in forensic science from John Jay College of Criminal Justice and completed an internship in trace evidence analysis. During his employment by the State Police, Lesniak had attended numerous classes given by the FBI and ATF, the federal Bureau of Alcohol, Tobacco, and Firearms, and he had received instruction from many other sources on a variety of disciplines in forensic evaluation of potential evidence for criminal prosecutions.
In his twenty-seven years as a forensic scientist, Lesniak had participated in ten cases that required comparison of garbage bags. He was trained in the discipline by his supervisor during an important case in the 1980s, and he had read journal articles and spoken to people who work in plastic bag manufacturing to learn more about the subject. Lesniak explained his knowledge of the manufacturing process for plastic garbage bags in terms very similar to those used by Ruiz. He described the same causes for die lines or striation patterns.
As to tool mark analysis, Lesniak testified he was trained by ATF ballistics experts. Among many other competency tests over the years, he had taken a tool mark certification test each year since the certification procedures were established by the ATF, and he had passed every test. He had performed hundreds of tool mark *434 examinations. Of the approximately 200 times he had testified as a forensic science expert, three cases in New Jersey involved his expertise in tool mark identification.
Regarding the theory and methodology of the discipline, Lesniak testified that tools can leave marks on an examined object because of unique qualities and imperfections. If there are enough such marks, the analyst might be able to identify the type of tool, or sometimes the actual tool. Lesniak testified he did not need expertise as to every potential tool before undertaking an examination. He could learn through examination and further research how a tool new to his experience worked and might have left distinctive marks.
For this case, Lesniak examined the two sets of garbage bags, first, by physically comparing their dimensions, thickness, shape, seals, skirts, folds, and perforation marks. He found all those physical properties to be consistent between the two sets. He then cut the bags and examined them on a large light box, finding die striations forming a "wood grain" type pattern that matched in both sets of bags. He displayed his findings by the use of photographs of the bags placed side by side. He also observed that, on both the open and sealed ends of all the bags, there was "a little cliff" where the straight edge of the bag dropped down and then went back up. This observation was significant to Lesniak's tool mark analysis. He conducted further research to learn the cause of the "cliffs."
Although the manufacturer of the bags recovered in this investigation could not be identified, Lesniak visited a plastic bag manufacturing plant in New Jersey to observe the cutting process. An unidentified plastics engineer at the plant suggested to him that a "cliff" at the cut edge of bags could be caused by an operator putting one of the cutting blades in backwards. Relying in part on his understanding of the cause of "cliffs" at the edges of the bags, Lesniak testified at the pretrial hearing that the bags in which the body was wrapped and the bags with Bill's clothing were made on the same manufacturing line in close sequential order, perhaps as close as within twenty bags of one another.
After hearing cross-examination and considering counsel's arguments, the trial court ruled that Lesniak was qualified to testify as an expert in tool mark analysis and that he could explain his examination of the tool marks he actually observed on the bags. However, Lesniak was not permitted to testify that the bags were manufactured at the same time because he was not a chemist or an expert in plastic bag composition.
Lesniak's trial testimony was consistent with his testimony at the evidentiary hearing as limited by the court's ruling. He stated his opinion that the bags from the apartment and the bags from the suitcases were produced on the same extrusion line, but he did not testify that they were manufactured in close sequential order.
In the trial court, defense objections to Lesniak's testimony did not include the argument made for the first time on appeal that tool mark analysis as a discipline is not scientifically reliable. We do not have a factual record to evaluate thoroughly defendant's new argument that expert tool mark analysis should not be admitted at all in our courts. The trial court is not expected "to investigate sua sponte the extent to which the scientific community holds in esteem the particular analytical writing or research that the proponent of testimony advances as foundational to an expert opinion." Hisenaj, supra, 194 N.J. at 16, 942 A.2d 769. If a party opposes expert testimony on the ground that the field has not obtained *435 general acceptance, that party should raise that issue at trial. Ibid.
Despite the absence of a factual record, we have considered defendant's arguments based on scientific literature issued since the time of her trial. See State v. Behn, 375 N.J.Super. 409, 429-30, 868 A.2d 329 (App.Div.), certif. denied, 183 N.J. 591, 874 A.2d 1108 (2005). We find no error in the trial court's implicit acceptance of tool mark analysis as a proper subject for expert testimony.
In New Jersey, expert evidence must meet the standard articulated in Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923). Harvey, supra, 151 N.J. at 169, 699 A.2d 596. "Admissibility of scientific test results in a criminal trial is permitted only when those tests are shown to be generally accepted, within the relevant scientific community, to be reliable." State v. Chun, 194 N.J. 54, 91, 943 A.2d 114, cert. denied, ___ U.S. ___, 129 S.Ct. 158, 172 L.Ed.2d 41 (2008). The technology cannot be merely experimental, and the demonstrable technique must be widely accepted within the relevant profession. Harvey, supra, 151 N.J. at 171, 699 A.2d 596. To demonstrate acceptance, the proponent of the evidence can present (1) expert testimony as to the general acceptance in the profession of the premises on which the analysis was based; (2) authoritative scientific and legal writings; or (3) judicial opinions that indicate the expert's premises have gained general acceptance. State v. Kelly, 97 N.J. 178, 210, 478 A.2d 364 (1984).
Here, Lesniak testified that the FBI and ATF offer training courses in tool mark analysis, and a standardized proficiency examination has been devised to certify tool mark analysts. He explained the basic premises of the discipline and provided examples of how such tool mark analysis is performed. He stated he had been conducting tool mark examinations for many years and had previously testified as an expert in that discipline. His testimony, therefore, established the general acceptance of the discipline in the forensic evidence community.
Moreover, tool mark analysis is not a newcomer to the courtroom. See Ramirez v. State, 810 So.2d 836, 845-46 (Fla.2001) (theory and acceptance of tool mark evidence in the courts under the Frye standard of admissibility). Testimony by tool mark experts has been admitted in New Jersey courts without objection. See Behn, supra, 375 N.J.Super. at 419, 868 A.2d 329 (testimony from "a ballistics and tool mark identification expert"); State v. Cito, 213 N.J.Super. 296, 299, 517 A.2d 174 (App.Div. 1986) (tool mark expert identified screwdriver seized from the defendant's home as tool that was used to break into burglarized home), certif. denied, 107 N.J. 141, 526 A.2d 203 (1987).
Courts in other jurisdictions have also admitted tool mark evidence. See, e.g., United States v. Bowers, 534 F.2d 186, 193 (9th Cir.) (record was sufficient to show that tool mark identification rests upon scientific basis and is reliable and a generally accepted procedure), cert. denied, 429 U.S. 942, 97 S.Ct. 360, 50 L.Ed.2d 311 (1976); United States v. Monteiro, 407 F.Supp.2d 351, 372 (D.Mass.2006) (tool mark identification of cartridge casings is admissible); Commonwealth v. Foreman, 797 A.2d 1005, 1017-18 (Pa.Super.Ct.2002) ("tool mark identification is a scientifically recognized area for expert testimony in this Commonwealth").
In Ramirez, supra, 810 So.2d at 851-52, the Supreme Court of Florida analyzed in depth, and ultimately rejected as inadmissible, an expert's testimony that a specific knife caused wounds to the body of a murder victim. In the course of its review, *436 however, the court distinguished general acceptance of tool mark analysis when examining hard surfaces as opposed to soft human tissue. The court cited a long history of cases from many jurisdictions indicating judicial acceptance of tool mark analysis as applied to marks left upon hard surfaces. Id. at 845-46. Here, Lesniak's tool mark analysis involved an object, the garbage bags, rather than human tissue.
Defendant's criticism of tool mark analysis is extrapolated from commentary in a report by the National Research Council of the National Academy of Sciences titled Strengthening Forensic Science in the United States: A Path Forward (2009) ("NAS report"). The NAS report was issued in 2009, after defendant's trial. It contains some criticism of tool mark analysis, including lack of information about variances among individual tools, lack of a clearly defined process, and a limited scientific base of knowledge. Id. at 5-18 to 5-21. But the NAS report does not label the discipline "junk science." It acknowledges that tool mark analysis can be helpful in identifying a class of tools, or even a particular tool, that could have left distinctive marks on an object. Id. at 5-21. The report concludes that development of a precisely specified and scientifically justified testing protocol should be the goal of tool mark analysis. Ibid.
Since the NAS report was issued, at least two courts have refused to exclude forensic evidence based on criticism contained in that report. See United States v. Rose, 672 F.Supp.2d 723, 725 (D.Md.2009) (fingerprint analysis); Johnston v. State, 27 So.3d 11, 20-23 (Fla.) (fingerprint and footwear analysis), cert. denied, ___ U.S. ___, 131 S.Ct. 459, 178 L.Ed.2d 292 (2010). As noted in those cases, the purpose of the NAS report is to highlight deficiencies in a forensic field and to propose improvements to existing protocols, not to recommend against admission of evidence. See Rose, supra, 672 F.Supp.2d at 725 (quoting Hon. Harry T. Edwards [co-chair of committee], Statement Before U.S. Senate Judiciary Committee (March 18, 2009) ("nothing in the [NAS] Report was intended to answer the 'question whether forensic evidence in a particular case is admissible under applicable law'")).
Defendant cites two decisions that have ruled expert testimony inadmissible after considering criticisms contained in National Research Council reports. In Ragland v. Commonwealth, 191 S.W.3d 569, 578 (Ky.2006), the issue was the reliability of comparative bullet lead analysis, a discipline involving metallurgy, which the FBI had already announced it would no longer pursue. Id. at 579. In Commonwealth v. Lanigan, 413 Mass. 154, 596 N.E.2d 311, 314-16 (1992), the court relied on a National Research Council report on DNA profile frequencies to conclude that the DNA identification proffered in that case was not scientifically reliable. The DNA report referenced in Lanigan is not the 2009 NAS report, and it did not constitute the sole basis for the Massachusetts court's decision. In Harvey, supra, 151 N.J. at 197-99, 699 A.2d 596, our Supreme Court addressed concerns raised in Lanigan about DNA methodology and concluded that the National Research Council criticism may have affected the weight and credibility of the scientific evidence, not its admissibility. Neither Ragland nor Lanigan supports defendant's assertion that the 2009 NAS report provides sufficient reason to exclude Lesniak's tool mark testimony.
"Proof of general acceptance does not mean that there must be complete agreement in the scientific community about the techniques, methodology, or procedures that underlie the scientific evidence." *437 Chun, supra, 194 N.J. at 91-92, 943 A.2d 114. Tool mark identification has been generally accepted and admitted in many courts, both within and outside New Jersey. On the record developed at trial in this case, and considering the arguments made now on appeal, we find no error in admission of tool mark analysis as a field appropriate for expert testimony.
Defendant also argues that Lesniak's opinion about the "cliffs" on edges of the bags was inadmissible hearsay from an unidentified person and not a valid basis for expert testimony. Lesniak explained that on his visit to a manufacturing plant, he personally examined the tool that cut bags, and he observed how a blade might be replaced backwards. After seeing how the cutting tool worked, he concluded that the "cliffs" in the bags in this case were likely caused by a backwards blade. He thus formulated his own opinion. There is nothing improper about an expert obtaining information from an outside source, as long as the expert makes an independent evaluation of the information and is able to explain the basis for the opinion that he reached. See Noel, supra, 157 N.J. at 149, 723 A.2d 602.
We reject without further discussion defendant's challenge to Lesniak's qualifications. R. 2:11-3(e)(2). We conclude the trial court did not err in admitting the tool mark testimony of Lesniak and his opinion matching the two sets of garbage bags.
Finally, even if Lesniak's tool mark analysis should have been excluded, its admission was at most harmless error. Much of Lesniak's testimony about the garbage bags was duplicative of Ruiz's testimony. Lesniak's testimony was not "clearly capable of producing an unjust result," R. 2:10-2, because Ruiz persuasively provided the same expert opinions on the basis of thorough and complete visual and chemical examination of the two sets of bags.

B.
Defendant asserts the trial court erred in limiting testimony offered by the defense from Marcie Paulk, Bill McGuire's ex-wife, and from George Lowery, a consultant who was acquainted with Bill through their collaborative work on a computer project.

1.
Paulk was called by the defense to testify that Bill walked away from their marriage in 1992 and did not reappear. She would have testified that Bill used their credit cards to their limits and drove Paulk into bankruptcy. The defense argued Paulk's testimony would add credence to defendant's statements that Bill walked out on his second marriage on April 29, 2004. It also would have explained defendant's conduct after Bill's disappearance, such as changing bank accounts and not filing a missing person's report, as well as her attitude about the murder as captured on wiretapped telephone conversations.
The court ruled that Paulk's proposed testimony from so many years earlier did not constitute admissible habit or custom evidence, and the remote time made it irrelevant to issues in this case and ultimately prejudicial. Further, it was "inappropriate and inflammatory in that it really amounts to a character attack and an appeal to the sympathy of the jury."
Paulk subsequently testified before the jury about an email she had received from Bill in early 2004, which was relevant to his alleged use of the home computer, but she was not questioned about the circumstances of their marriage and divorce.
A trial court has broad discretion under N.J.R.E. 403 to exclude evidence *438 that may be prejudicial or that may divert the jury's focus from the relevant issues in the case. See State v. Sands, 76 N.J. 127, 144, 386 A.2d 378 (1978). Under that rule of evidence, potentially relevant evidence may be excluded if its probative value is substantially outweighed by the risk of undue prejudice, confusion of issues, or undue delay. The trial court's balancing of factors under N.J.R.E. 403 "is subject to the abuse of discretion standard, which sustains the trial court's ruling `unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide [of] the mark that a manifest denial of justice resulted.'" State v. Lykes, 192 N.J. 519, 534, 933 A.2d 1274 (2007) (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492, 734 A.2d 1147 (1999)). There was no denial of justice in excluding Paulk's proposed testimony.
The testimony was clearly not admissible under N.J.R.E. 406 as evidence of Bill's habit or routine of leaving wives. It was potentially relevant to explain defendant's behavior following Bill's disappearance, but it was also highly inflammatory and prejudicial. It would have injected into the trial collateral and complex issues about Bill's first marriage. It had the potential of diverting the focus of the jury and confusing issues by raising matters that occurred twelve years earlier and that could not be adequately addressed in this case. Balanced against the potential prejudice and confusion of issues, the probative value of Paulk's proposed testimony was slight. We conclude the trial court did not abuse its discretion in excluding it.

2.
The defense also proffered that George Lowery would testify "regarding conversations with William McGuire where he talked about wanting to purchase or possess a gun because his headlights kept getting stolen out of his car in late 2003." Lowery would have testified that Bill told him he "wanted to get a gun, but was not able to. He couldn't get a permit. ... He didn't share that with Mr. Lowery, that he was a convicted felon, but just said he couldn't get a permit, and he was going to have ... his wife ... secure that for him."
After hearing argument from both sides, the trial court ruled that Lowery's testimony would be limited to having had a discussion with Bill about the purchase of a firearm without specifics of Bill's alleged statements. The court stated that Bill's "state of mind prior to the time of the murder is not really that significant," and his statements were inadmissible hearsay because they "cannot be verified at this point or determined to be reliable."
Before the jury, Lowery testified that he began working on a project with Bill in January 2003 and met with him every one to two months. He had a conversation with Bill two or three months before he died about the purchase of a firearm. The prosecution cross-examined Lowery about his limited relationship with Bill, his following the news of Bill's death on the internet, and his failure to reveal information about discussing firearms with Bill in his first two interviews with detectives.
Defendant argues that Bill's statements to Lowery were admissible under two exceptions to the hearsay rule  state of mind, N.J.R.E. 803(c)(3), and statements against penal interest, N.J.R.E. 803(c)(25). She contends that Bill's statements were relevant to establishing that defendant purchased the gun in Pennsylvania at Bill's request rather than as part of a plan to murder him.
Under N.J.R.E. 803(c)(3), an out-of-court statement is admissible if it was "made in good faith of the declarant's then existing state of mind, emotion, sensation *439 or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health)." "Simply stated, the `state of mind' exception to the hearsay rule allows admission of extrajudicial statements to show the state of mind of the declarant when it is at issue in a case." State v. Benedetto, 120 N.J. 250, 255-56, 576 A.2d 828 (1990). "Particularly where the declarant is deceased, the rule is rooted in necessity and justified upon the basis that the circumstances provide a rational substitute for the benefit of cross-examination." State v. Downey, 206 N.J.Super. 382, 390, 502 A.2d 1171 (App.Div.1986).
Many years ago in State v. Thornton, 38 N.J. 380, 185 A.2d 9 (1962), cert. denied, 374 U.S. 816, 83 S.Ct. 1710, 10 L.Ed.2d 1039 (1963), our Supreme Court stated:
When a person's engagement in a course of conduct or an act ... is relevant to the resolution of a controversy over an occurrence which becomes the subject of subsequent litigation ... declarations of the person of his present intention or plan to do so, are competent, substantive, and original evidence of his probable engagement in the course of conduct or act.
[Id. at 389, 185 A.2d 9 (emphasis added).]
Recently in State v. McLaughlin, 205 N.J. 185, 14 A.3d 720 (2011), the Court stated that "to be admissible under the state of mind exception to the hearsay rule, the declarant's state of mind must be `in issue.'" 205 N.J. at 206, 14 A.3d at 733 (quoting State v. Boratto, 154 N.J.Super. 386, 394, 381 A.2d 794 (App.Div.1977), aff'd in part, rev'd in part, 80 N.J. 506, 404 A.2d 604 (1979)).
When recommending adoption of this so-called Hillmon doctrine, see Mut. Life Ins. Co. v. Hillmon, 145 U.S. 285, 294-300, 12 S.Ct. 909, 912-14, 36 L.Ed. 706, 710-12 (1892), the drafters of N.J.R.E. 803(c)(3) retained in the rule a "good faith" requirement to provide discretion to trial courts to exclude out-of-court statements that are unreliable. See Biunno, Current N.J. Rules of Evidence, 1991 Supreme Court Committee Comment on N.J.R.E. 803(c)(3) (2008) at 773.
Here, Bill's alleged statements may have been an expression of his then-existing state of mind in January or February 2004 when he spoke to Lowery, but they were not a clear expression of a "present intention or plan" to have his wife buy a gun, see Thornton, supra, 38 N.J. at 389, 185 A.2d 9, either at that time or later in April 2004 when defendant actually bought a gun. Bill's alleged statements lacked specificity, and there was insufficient evidence that Bill had made them to Lowery in "good faith." We find no abuse of discretion in the trial court's ruling that the defense did not establish the reliability of Lowery's proffered testimony, or Bill's present intention or plan.
Nor did the trial court abuse its discretion in excluding the proffered testimony as a hearsay exception under N.J.R.E. 803(c)(25). That rule provides for the admission of an out-of-court statement for the truth of the matter asserted if "at the time of its making ... [the statement] so far tended to subject declarant to civil or criminal liability, ... that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true." Ibid. "[S]tatements that so disserve the declarant are deemed inherently trustworthy and reliable." State v. White, 158 N.J. 230, 238, 729 A.2d 31 (1999). Whether a statement is in fact against the declarant's interest must be determined from the circumstances of each case. State v. Brown, 170 N.J. 138, 149, 784 A.2d 1244 (2001).
*440 Under 18 U.S.C.A. § 922(g)(1), it is unlawful for any person who has been convicted of a crime to receive or possess a firearm or ammunition. Further, under 18 U.S.C.A. § 922(h), it is unlawful for another to act on that person's behalf to procure a firearm. Evidence at trial revealed that Bill had been convicted of a crime.[6] The defense argued that Bill's alleged statements to Lowery were against his penal interests. There was no evidence, however, that Bill believed his wife's purchasing a gun might subject him to criminal prosecution or penalties. We find no error in the trial court's ruling that Bill's alleged statement to Lowery was not "necessarily contrary to his penal interest" and, therefore, did not meet the requirement of N.J.R.E. 803(c)(25).
We also agree with the trial court's assessment that Lowery's proffered testimony was not particularly probative of any issue before the jury. First, statements made in casual conversation to a co-worker months before defendant's purchase of the Taurus handgun had limited tendency to prove that Bill followed through and actually asked defendant to buy a gun sometime near April 26, 2004. More important, Bill's alleged desire to have defendant buy a gun was not inconsistent with her use of the same gun to shoot him. Even if the original idea came from Bill, that fact did not negate the prosecution's ballistics evidence identifying the gun defendant bought with bullets found in Bill's body, or evidence that defendant concealed her purchase even after Bill's disappearance and the discovery of his murder.
In sum, we conclude the trial court did not abuse its discretion in excluding testimony by Lowery about the specifics of his alleged conversation some two or three months before Bill's death.

V.
Defendant makes several arguments alleging prosecutorial misconduct. She contends the prosecutors elicited inadmissible evidence and disregarded the trial court's rulings. She also contends the prosecutor improperly commented in closing argument about the absence of evidence that had been excluded by the court and asked the jury to speculate on matters not supported by the evidence.
"A prosecutor's remarks and actions must at all times be consistent with his or her duty to ensure that justice is achieved." State v. Williams, 113 N.J. 393, 447-48, 550 A.2d 1172 (1988). It is as much a prosecutor's duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. State v. Ramseur, 106 N.J. 123, 320, 524 A.2d 188 (1987). But "[p]rosecutorial misconduct is not ground for reversal of a criminal conviction unless the conduct was so egregious that it deprived defendant of a fair trial." Id. at 322, 524 A.2d 188.
In determining whether a conviction should be reversed, the reviewing court must consider whether defense counsel made a timely objection. State v. Smith, 167 N.J. 158, 181-82, 770 A.2d 255 (2001); Ramseur, supra, 106 N.J. at 322-23, 524 A.2d 188. If no objection was made, remarks usually will not be deemed prejudicial. Ramseur, supra, 106 N.J. at 323, 524 A.2d 188. Defendant must show plain error to be entitled to a new trial. State v. Feal, 194 N.J. 293, 312, 944 A.2d *441 599 (2008). There must be "`a reasonable doubt as to whether the error led the jury to a result that it otherwise might not have reached.'" Ibid. (quoting State v. Daniels, 182 N.J. 80, 102, 861 A.2d 808 (2004)).
Here, defendant objected to some of the prosecutor's questioning of witnesses but did not raise any objection to the summation comments now alleged to be grounds for reversal of her conviction. Having reviewed the entire record of the trial, we find no prejudicial error in the prosecutors' conduct at trial.

A.
Defendant complains that a prosecutor elicited inflammatory testimony from Dr. Miller concerning his affair with defendant. The trial transcript shows, however, that the prosecutor asked a few questions to establish the nature of the extra-marital relationship as relevant to defendant's motive to kill her husband. "In criminal prosecutions, whenever the motive or the intent of the accused is important and material, a somewhat wider range of evidence is permitted in showing such motive or intent than is allowed in the support of other issues." State v. Rogers, 19 N.J. 218, 228, 116 A.2d 37 (1955). Defense counsel did not object to the questions about the extra-marital affair, and the defense itself later pursued cross-examination testimony from Miller that he continued to be intimate with defendant after he had cooperated with the police and agreed to record telephone conversations with her.
Additionally, the prosecutor told the jury in her opening statement that defendant was not on trial for engaging in an extra-marital affair. She repeated the same admonition in her closing argument. In its final instructions to the jury, which the jury also received in writing, the trial court reinforced the limited purpose of any testimony about problems in defendant's marriage. The court said that such evidence could only be considered if the jury believed it demonstrated defendant's state of mind as relevant to a motive; it could not be used to show that defendant was a bad person and therefore committed the crimes charged in the indictment. We find no error in the questioning of Miller about his personal relationship with defendant.
Next, defendant complains that the prosecutor improperly elicited expert handwriting testimony from lay witness Tamar Joffee, the office manager of the Weichert Realty office in Franklin Lakes. After showing Joffee the handwritten label on the Federal Express package, the prosecutor asked "is that Cindy Ligosh's handwriting?" When Joffee said it was not, the court itself initiated a sidebar conference and eventually ruled that Joffee was not qualified to provide an opinion about the handwriting. The court struck Joffee's answer and instructed the jury to disregard it because Joffee had "freely admitted she's not a handwriting expert." The court's ruling and instruction corrected any prejudice from the brief, opinion testimony. See State v. Manley, 54 N.J. 259, 271, 255 A.2d 193 (1969) (jury is assumed to have followed the court's limiting instruction). Moreover, defendant was not convicted of the charges in the second indictment related to the Federal Express package.
Defendant also complains about the prosecutor's cross-examination of defense private investigator Jay Salpeter on the subject of gambling and EZ pass records related to Atlantic City. We have found no error in the manner or form of cross-examination. The prosecutor did not seek to elicit evidence that had been ruled inadmissible. See State v. Rose, 112 N.J. 454, 517, 548 A.2d 1058 (1988).
*442 Nor did she continue to ask questions after the court ordered the line of questioning to stop. See State v. Hinds, 278 N.J.Super. 1, 17-18, 650 A.2d 350 (App. Div.1994), reversed on other grounds, 143 N.J. 540, 674 A.2d 161 (1996). The trial court in effect ordered the prosecutor not to ask certain leading questions on cross-examination of Salpeter, despite the provisions of N.J.R.E. 611(c) to the contrary, even after the prosecutor represented that she had a good faith basis for the facts included in those questions. The prosecutor attempted to ask the questions in a form that the court deemed appropriate. There was no prosecutorial misconduct. In fact, the defense received a more favorable ruling than the rules of evidence and the circumstances warranted.
We have considered defendant's other claims of prosecutorial misconduct in the questioning of witnesses and reject them without further discussion in a written opinion. R. 2:11-3(e)(2).

B.
Regarding the prosecutor's summation, defendant asserts improper and unfair argument highlighting the absence of defense evidence that the court had ruled inadmissible and asking the jury to speculate about facts outside the record.
"[P]rosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries." State v. Frost, 158 N.J. 76, 82, 727 A.2d 1 (1999). "[P]rosecuting attorneys, within reasonable limitations, are afforded considerable leeway in making opening statements and summations." State v. DiFrisco, 137 N.J. 434, 474, 645 A.2d 734 (1994). But a prosecutor's latitude is not unfettered. Williams, supra, 113 N.J. at 447, 550 A.2d 1172. The prosecutor is granted wide latitude to make "fair comment" on the evidence so long as he or she stays within legitimate inferences that can be deduced from the evidence. See State v. Mayberry, 52 N.J. 413, 437, 245 A.2d 481 (1968), cert. denied, 393 U.S. 1043, 89 S.Ct. 673, 21 L.Ed.2d 593 (1969).
In this case, defense counsel did not object to any of the prosecutor's closing remarks now challenged on appeal. Therefore, the plain error standard of review applies. R. 2:10-2; State v. Papasavvas, 163 N.J. 565, 626, 751 A.2d 40, corrected by 164 N.J. 553, 753 A.2d 1148 (2000). The alleged error must have been of sufficient magnitude to raise a reasonable doubt as to whether it led the jury to a result it would otherwise not have reached. Feal, supra, 194 N.J. at 312, 944 A.2d 599.

1.
In taped conversations with Miller and Finn, defendant said she bought a handgun because Bill had asked her to do so. She said he was a convicted felon who could not get a permit to buy a gun himself. As previously discussed, the trial court excluded proffered testimony from George Lowery that Bill had told him he could not get a permit and would instead ask his wife to buy a gun. Before the jury, Lowery was permitted to testify only that, two or three months before Bill died, he had discussed with Lowery the purchase of a firearm.
During his summation, defense counsel argued as follows regarding Lowery's testimony:
[I]n April of 2004, Bill McGuire was talking about the purchase of a gun, undisputed. Well, the State will dispute it, but a co-worker of his, George Lowery came in here and said he told them, he told law enforcement [in] October of 2005 that Bill McGuire and he had a conversation about the purchase of a gun, and they never reached out to him *443 again. . . . They wanted nothing to do with this guy, because that also corroborates everything Melanie McGuire has been saying on these tapes they have been listening to about Bill wanted a gun and he couldn't get one because he was a convicted felon and she had to buy one for him. It corroborates everything she said, so they attack this guy. . . .
The prosecutor made the following response in her closing argument:
Let me mention something else that was raised yesterday regarding the gun.
You heard from Mr. Lowery on the defense case who told you, and this is in the transcript, he had a conversation with Bill about purchasing a gun, but there is no evidence before you or during this trial that Bill wanted to purchase a gun.
Look at the question and look how it's worded. . . . I wouldn't put much stance [sic] on what Mr. Lowery said; but even so, what he said was there was a conversation with Bill McGuire about purchasing a gun. Not, not that Bill McGuire wanted to purchase a gun, and that's a very, very distinct and important difference.
There is no evidence before you except for what the defendant says herself as an excuse that Bill McGuire wanted that gun.
Defendant neither objected nor asked for a curative instruction to address the prosecutor's remarks. For the first time on appeal, defendant argues plain error, citing cases including State v. Ross, 249 N.J.Super. 246, 247, 592 A.2d 291 (App. Div.), certif. denied, 126 N.J. 389 (1991).
In Ross, the defendant was charged with aggravated sexual assault of a ten-year-old girl. To refute the State's anticipated argument that a child that age could not have the sexual knowledge she displayed if an assault had not occurred, the defendant sought to present evidence that the child had twice before claimed to have been assaulted by adult male relatives. Id. at 248-49, 592 A.2d 291. The trial court excluded that evidence under the Rape Shield Law, N.J.S.A. 2C:14-7. 249 N.J.Super. at 248-49, 592 A.2d 291. In summation, the prosecutor made the anticipated argument, that a ten-year-old child could not have fabricated the incident with the defendant because she would not have the requisite detailed knowledge of the sexual conduct. Id. at 249-50, 592 A.2d 291. We reversed defendant's conviction, stating:
Obviously the prosecutor was aware that the child's claims of prior sexual victimization. . . provided her with a degree of knowledge potentially belying her alleged naivete. For the prosecutor to have made that argument knowing it to be at least arguably contrary to facts which defendant was precluded from adducing was improper, unfair, and, in view of the paramountcy of the credibility issue, irremediably prejudicial. On that basis alone, defendant is entitled to a new trial.
[Id. at 250, 592 A.2d 291.]
As in Ross, prosecutorial misconduct has been found in other cases where prosecutors made arguments clearly contrary to information that was excluded from evidence. See State v. Sexton, 311 N.J.Super. 70, 80-81, 709 A.2d 288 (App.Div.1998) (error in prosecutor's summation argument that the homicide weapon belonged to the defendant with knowledge of excluded evidence that the gun was registered to another person), aff'd, 160 N.J. 93, 733 A.2d 1125 (1999); United States v. Toney, 599 F.2d 787, 788-91 (6th Cir.1979) (error in prosecutor's argument that the defendant charged with robbery produced no evidence to support a claim he had won "bait bills" in a dice game after the trial *444 court had erroneously excluded on hearsay grounds another person's statement to the same effect).
In this case, the State contends that the prosecutor's quoted remarks were fair comment because of misrepresentations in defense counsel's closing argument. A prosecutor's otherwise prejudicial arguments may be deemed harmless if made in response to defense arguments. See State v. Munoz, 340 N.J.Super. 204, 216, 774 A.2d 515 (App.Div.), certif. denied, 169 N.J. 610, 782 A.2d 427 (2001); State v. C.H., 264 N.J.Super. 112, 135, 624 A.2d 53 (App.Div.), certif. denied, 134 N.J. 479, 634 A.2d 526 (1993). It is true that defense counsel misrepresented the time when Lowery's conversation with Bill had occurred, and his remarks exaggerated that Lowery's testimony corroborated "everything" defendant had said about a gun. But defense counsel did not misrepresent the actual content of Lowery's testimony. The prosecutor's response exceeded the scope of inaccuracies in defense counsel's summation.
Nevertheless, unlike the cases cited in which prosecutorial misconduct was found and the defendant's conviction was reversed, Lowery's proposed testimony was properly found by the trial judge to be both inadmissible and unreliable. Strictly speaking, there was no reliable evidence in this case that Bill had wanted defendant to buy a gun for him. In that sense, the prosecutor's comments are distinguishable from the unfair arguments we found in Ross, supra, 249 N.J.Super. at 250, 592 A.2d 291, and Sexton, supra, 311 N.J.Super. at 80-81, 709 A.2d 288.
Furthermore, the prosecutor's remarks were harmless in the context of the entire summation and all the evidence at trial. See Jenewicz, supra, 193 N.J. at 472, 940 A.2d 269; State v. Marshall, 123 N.J. 1, 152, 586 A.2d 85 (1991); State v. Tirone, 64 N.J. 222, 229, 314 A.2d 601 (1974). There must be "some degree of possibility that [the errors] led to an unjust result." State v. R.B., 183 N.J. 308, 330, 873 A.2d 511 (2005). "The possibility must be real, one sufficient to raise a reasonable doubt as to whether [the errors] led the jury to a result it otherwise might not have reached." State v. Bankston, 63 N.J. 263, 273, 307 A.2d 65 (1973).
Here, the prosecutor's lengthy summation thoroughly and meticulously covered the mass of circumstantial and forensic evidence. Moreover, as previously discussed, whether Bill had wanted defendant to buy a gun did not refute evidence that defendant had used that gun to kill him. In view of all the evidence we have recited, the challenged remarks do not raise "a reasonable doubt as to whether the error led the jury to a result that it otherwise might not have reached." Daniels, supra, 182 N.J. at 102, 861 A.2d 808.
We conclude there was no plain error in the prosecutor's quoted summation remarks.

2.
Next, defendant contends that the prosecutor's summation contained a number of improper, speculative arguments outside the scope of evidence admitted for the jury's consideration. She complains that the prosecutor improperly argued that the absence of trace evidence in the Woodbridge apartment showed defendant's extraordinary efforts to conceal evidence of the crimes, that drop cloths may have been used to prevent blood or other body tissue from spilling in the apartment, that defendant or an accomplice could have used a towel to muffle the sound of a reciprocating saw when cutting the body, and that ice or refrigeration may have been used to preserve parts of the body.
*445 A prosecutor may not invite the jury to speculate about facts not in evidence. Frost, supra, 158 N.J. at 86, 727 A.2d 1. While a prosecutor may present to the jury the State's theory of the case, the presentation will constitute prosecutorial misconduct if it draws unreasonable inferences from the evidence adduced at trial. Papasavvas, supra, 163 N.J. at 616, 751 A.2d 40.
In its closing argument, the defense had emphasized the absence in the apartment of trace evidence of blood, tissue, or DNA, the absence of bullet holes or saw marks, and the absence of testimony from neighbors about gunshots or the sounds of a power saw. The defense argued the lack of such evidence showed that the murder and desecration of the body could not have occurred in the Woodbridge apartment.
In response, the prosecutor argued the State did not have to prove specifically where the crimes were committed, but the cutting of the body and the draining of blood may have occurred in the shower stall of the master bathroom. Based on testimony by an expert anthropologist about the cuts in the body, the prosecutor argued that defendant or her accomplice could have positioned the body to avoid leaving saw marks in the shower stall. The prosecutor also argued that drop cloths may have been used to avoid spilling blood or tissue and that the bathroom and the rest of the apartment had been scrubbed unusually clean and freshly painted by defendant and helpers, not by the landlord, before the first police search was conducted in June 2004.
Lesniak had testified he found no trace evidence providing anyone's DNA in the apartment despite several thorough searches. Another witness had testified of an unusual smell of bleach and cleanser in the master bathroom. The prosecutor also made use of testimony by defense witnesses and others that defendant was an efficient, hard-working nurse at her place of employment. The prosecutor argued that the absence of even the McGuire family's own DNA in the apartment demonstrated unusual efforts to clean the apartment and eliminate evidence. These arguments were based on reasonable inferences drawn from the evidence produced at trial. Furthermore, the reference to drop cloths was tied to expert testimony that chips of paint and PVC pipe material had been found in the suitcases along with Bill's body.
The prosecutor may have treaded close to the line of permissible inferences when she argued that sounds of a reciprocating saw may have been muffled with a towel. There was no evidential support for that argument, but it was made immediately after the prosecutor argued that the polyester fiber evidence found on one of the bullets recovered from Bill's body suggested the killer had used a pillow to muffle the sound of gunfire. Also, the next-door neighbor had testified she and her family were not in their apartment much of the daytime during the relevant time period. The prosecutor's brief remark about muffling the sound of a reciprocating saw was not so egregious that it deprived defendant of a fair trial.
The defense had also argued that the condition of Bill's lower legs, recovered in the Chesapeake Bay on May 5, 2004, were contrary to the prosecution's theory that he had been murdered in the last days of April. The defense cited the testimony of the Virginia medical examiner that the lower legs looked "fresh," consistent with the condition of a body that had been dead only one day in a cool, dry environment. To explain why Bill's legs looked fresh, the prosecutor argued that defendant and her accomplice could have used ice to refrigerate *446 the body in the shower stall or elsewhere. Again, no evidence had been presented at trial to suggest that defendant procured quantities of ice near the time of Bill's disappearance. Nor did the medical examiner testify that the legs had been refrigerated or exposed to ice.
The prosecutor's argument in that regard was improper speculation. See Williams, supra, 113 N.J. at 447, 550 A.2d 1172 ("a lawyer shall not: [s]tate or allude to any matter . . . not . . . supported by admissible evidence") (quoting Model Code of Professional Responsibility DR7-106(c) (1979)). Had defense counsel made an objection, the trial judge could have stricken the argument and instructed the jury to disregard it. See id. at 452, 550 A.2d 1172. It is important to note, however, that the prosecutor did not ask the jury to speculate about matters extraneous to the relevant facts, such as the arguments determined to be prejudicial in Frost, supra, 158 N.J. at 85-87, 727 A.2d 1 (that a police officer's career would be jeopardized if he lied in his testimony). We conclude the objectionable remarks did not "substantially prejudice[ ] defendant's fundamental right to have a jury fairly evaluate the merits of [her] defense." State v. Timmendequas, 161 N.J. 515, 575, 737 A.2d 55 (1999); see also State v. Koskovich, 168 N.J. 448, 488-89, 776 A.2d 144 (2001) (prosecutor's single reference in summation that there could have been yet another homicide victim was error but not reversible prosecutorial misconduct).
The prosecutor also overstepped the bounds of reasonable inferences from the evidence when she responded to defense arguments about the suspicious internet searches. Defendant had presented the testimony of her own computer expert, Jesse Lindmar, who had downloaded the entire hard drive of the McGuires' personal computer. Lindmar testified that some of the suspicious Google searches were made near times of visits to sites related to Bill's work or interests. He acknowledged on cross-examination, however, that he had not reviewed the hard drive for proximity of suspicious searches to sites associated with defendant's interests.
In responding to defense arguments that Bill was the person who engaged in the suspicious Google searches, the prosecutor argued that Bill was a computer technician who would have known how to erase suspicious search topics completely from the computer hard drive. No evidence was presented, however, that Bill had such knowledge, skills, or motivation.
These isolated arguments of the prosecutor asked the jury to speculate beyond the evidence, but
not every departure from the facts and reasonable inferences necessarily calls for a reversal, and "on the question whether the improper comment shall have that effect, the making by trial counsel of a timely and proper objection and the action of the trial judge in connection therewith are ordinarily controlling considerations."
[State v. Wilson, 57 N.J. 39, 50-51, 269 A.2d 153 (1970) (quoting State v. Vaszorich, 13 N.J. 99, 119, 98 A.2d 299 (1953)).]
A timely objection in this case could have cured any potential harm caused by speculative remarks. See State v. Koedatich, 112 N.J. 225, 322-23, 548 A.2d 939 (1988), cert. denied, 488 U.S. 1017, 109 S.Ct. 813, 102 L.Ed.2d 803 (1989). Absence of contemporaneous objection may lead to a fair inference that "in the context of the trial the error was actually of no moment." State v. Nelson, 173 N.J. 417, 471, 803 A.2d 1 (2002) (quoting Macon, supra, 57 N.J. at 333, 273 A.2d 1).[7]
*447 For a conviction to be reversed, the challenged comment "must have been clearly and unmistakably improper, and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Timmendequas, supra, 161 N.J. at 575, 737 A.2d 55. Although a few of the prosecutor's arguments ranged beyond the strict confines of the evidence, those arguments were brief and isolated. Viewed in the context of the State's entire closing argument and all the evidence reviewed with the jury, the few objectionable remarks did not have the capacity to influence the jury's verdict. Defendant was not deprived of a fair trial. See Koskovich, supra, 168 N.J. at 488, 776 A.2d 144. We find no plain error in the prosecutor's summation.[8]

VI.
Defendant argues that extensive media coverage of the trial, including its live broadcast on Court TV, infected the judicial process and exposed jurors to inflammatory material extraneous to the admissible evidence.
Near the end of the trial, the court excused Juror Number 14 because of flooding at her home. After deliberations began by twelve other jurors, the court clerk found a note in the jury room that Juror 14 had written. The note said in full:
To all
I cannot believe I am not there to see this through with all of you. I feel a little disappointed, although I can't say I'm not relieved as well. I had prayed on Sunday for help with the awesome task ahead of me this week and he sent wind and rain and I was excused. Careful what you pray for, right?
I am praying for all of you today, that you will have the wisdom to do what is right.
I have to tell you I spent all day yesterday reading blogs and watching closing arguments. It was so tempting to blog back, but I did not.
LindaI am the one w/ hard eyes
© and I intrigue the bloggers. They talk about us, but nothing terrible. Deb & Rafikyou must feel some relieve [sic] today too. Deb, if you get a moment (like you won't have all day) call me. [phone number].
Good luck to you all. You are in my thoughts.
The following morning, the trial judge reached Juror 14 by telephone and questioned her on the record and in the presence of counsel. The excused juror said she had left the note on the windshield of Juror 5's car. Her purpose was to express support for her fellow jurors. Regarding *448 the meaning she intended by her advice to "do what is right," Juror 14 said she was a religious person who prayed for help in making the right decision, but she did not know what the right decision was in this case. She also said she never discussed her views about a verdict with the other jurors. Asked what she meant by the comment about "hard eyes," Juror 14 said one of the jurors had been told about an internet blog referring to a juror with hard eyes, and the jurors had attempted to guess who that juror was.[9] Juror 14 could recall no other discussions of material from the internet or news media.
The judge then interviewed all twelve deliberating jurors individually, in his chambers but on the record. The attorneys were given free rein to question the jurors, provided they did not inquire about the course of the jury's deliberations. All the jurors had seen or heard the contents of the note from Juror 14. All the jurors said they did not interpret the note as urging them to reach a verdict either way, and Juror 14 had not expressed her opinion of the outcome before being excused. Questioned closely, the jurors all said the note had not and would not influence their decision.
At first, the judge was hesitant to ask jurors specifically what they understood to be the meaning of "do what is right," fearing that the question might elicit information about the jury's deliberations. Beginning with Juror 4, however, the judge asked each juror what that phrase meant and if it related to any prior conversations with Juror 14. Invariably, the jurors answered that the phrase simply meant the jury should strive to make a correct decision. The earlier answers of Jurors 1 through 3 were consistent with that interpretation.
Regarding the "hard eyes" comment, several jurors said they did not know what it meant. Juror 3 readily revealed that her sister had told her about the "hard eyes" description in a blog, and Juror 3 had mentioned the reference to other jurors. Some of the jurors recalled such a conversation. Several jurors said they had a general curiosity about how the media was describing the jurors. One juror was aware of a court blogger "who sits in the benches and depicts who everyone is." A few jurors were concerned that their names and addresses were being publicized.[10] The jurors explained that their interest in how they were perceived came up as part of an "overall discussion," and there was never a single juror or source passing along information about Court TV coverage of the trial or internet postings.
All the jurors denied obtaining factual information about the case from any outside source. They distinguished the comments and discussions about themselves from evidence about the crimes alleged and their task of evaluating that evidence. All stated they could continue to deliberate impartially and were not influenced in their decisions by concerns about media or internet coverage of them as jurors.
Based on these individual juror interviews, the judge concluded that the jury had not knowingly violated the court's instructions to avoid exposure to media reports of the trial. He concluded further that Juror 14's note was an insignificant, casual communication that would not affect *449 the jury's deliberations. The judge was convinced by the assurances of each juror "that they can follow the law and attempt to reach a verdict based solely on the evidence and the law."
Before the jurors resumed their deliberations, the judge instructed them again about avoiding communications from outside, including those about themselves. The jury then resumed deliberations and returned its verdicts at the end of the following day.
"Under the Sixth Amendment of the United States Constitution and Art. I, par. 10 of the New Jersey Constitution, criminal defendants are . . . entitled to a jury that is free of outside influences and will decide the case according to the evidence and arguments presented in court in the course of the criminal trial itself." State v. Williams, 93 N.J. 39, 60, 459 A.2d 641 (1983). "Securing and preserving an impartial jury goes to the very essence of a fair trial." State v. Bey, 112 N.J. 45, 75, 548 A.2d 846 (1988).
When jurors have been exposed to extraneous information, the court must act swiftly to investigate and to determine whether the jurors are capable of fulfilling their duty in an impartial and unbiased manner. State v. R.D., 169 N.J. 551, 557-58, 781 A.2d 37 (2001). In State v. Scherzer, 301 N.J.Super. 363, 487-88, 694 A.2d 196 (App.Div.), certif. denied, 151 N.J. 466, 700 A.2d 878 (1997), we said that "the trial judge must make a probing inquiry into the possible prejudice caused by any jury irregularity, relying on his or her own objective evaluation of the potential for prejudice rather than on the jurors' subjective evaluation of their own impartiality."
Once a hearing is conducted, "[a] new trial will be granted where jury misconduct or intrusion of irregular influences into the jury deliberation `could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge.'" State v. Grant, 254 N.J.Super. 571, 583, 604 A.2d 147 (App.Div.1992) (quoting Panko v. Flintkote Co., 7 N.J. 55, 61, 80 A.2d 302 (1951)); accord State v. Wormley, 305 N.J.Super. 57, 69, 701 A.2d 944 (App.Div. 1997), certif. denied, 154 N.J. 607, 713 A.2d 498 (1998); see also State v. Hightower, 146 N.J. 239, 266-67, 680 A.2d 649 (1996) (the same standard governs motions for a mistrial and for a new trial).
"A new trial, however, is not necessary in every instance where it appears an individual juror has been exposed to outside influence." R.D., supra, 169 N.J. at 559, 781 A.2d 37. As the United States Supreme Court has said, "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78, 86 (1982). "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Ibid. Both were present in this case.
The trial court applied the correct standard and burden of proof in determining whether extraneous information had a capacity to influence the jury's verdict. The evidence developed through the court's careful voir dire of the jurors affirmatively established that exposure to extrinsic blogger information had not and would not affect their decision. See Wormley, supra, 305 N.J.Super. at 69, 701 A.2d 944; Grant, supra, 254 N.J.Super. at 580-84, 588, 604 A.2d 147.
Defendant argues that "[f]or a former juror who had spent all day checking public *450 opinion to urge the other jurors to `do what is right' by itself creates an incalculable risk of prejudice." We disagree. The cases cited by defendant have found error in a prosecutor's exhortations to the jury "to do the right thing" or "send a message to the community." See, e.g., State v. Neal, 361 N.J.Super. 522, 537, 826 A.2d 723 (App.Div.2003); State v. Acker, 265 N.J.Super. 351, 356-57, 627 A.2d 170 (App.Div.), certif. denied, 134 N.J. 485, 634 A.2d 530 (1993); State v. Lockett, 249 N.J.Super. 428, 434-35, 592 A.2d 617 (App. Div.), certif. denied, 127 N.J. 553, 606 A.2d 366 (1991). The prosecutor's position on what is the right result is well-known to the jurors, and his or her urging jurors with such words implies reasons beyond the evidence for a guilty verdict. In this case, the prosecutor made no such plea to the jury.
The note from Juror 14 was mostly an innocuous expression of goodbye and good luck. The statement "I am praying for all of you today, that you will have the wisdom to do what is right" was neutral on its face. It did not urge a particular result, especially because Juror 14 had not expressed an opinion about the outcome of the trial. Furthermore, no deliberating juror gave a hint of being influenced by Juror 14's note.
The jury conduct in this case had much less potential for taint than that in Scherzer, supra, 301 N.J.Super. 363, 694 A.2d 196, where we concluded that the trial judge had properly addressed the issues and removed potential for prejudice. Id. at 496, 694 A.2d 196. In that case, the defendant alleged many instances of juror misconduct, including comments by jurors' co-workers that the defendants should hang. We stated that the extraneous communications did not "raise[ ] the specter of corruption, intimidation, and coercion." Id. at 492, 694 A.2d 196. "[A]ny presumption of prejudice was rebutted [by] the judge's thorough inquiry into the outside communication [and] his objective evaluation that prejudice was not established." Ibid.
Defendant argues that the jurors' preoccupation with how they were being portrayed in the media had the capacity to taint their verdict. But there is no evidence that the jurors' concerns affected their impartiality. Communications concerning public perceptions of the jury did not implicate evidentiary or proof issues at trial. That the jury knew a blogger was in the courtroom, or that a blog had made reference to the "hard eyes" demeanor of a juror, do not suggest any particular verdict.
There was also no evidence that any juror was personally active on the internet regarding the case while serving as a juror. The judge questioned the jurors thoroughly and determined that the information concerning the internet postings was passed on to the jury second-hand. Each of the jurors denied accessing the internet personally; each denied reading any blogs or message boards. The judge observed the jurors' responses and demeanor, and he accepted their credibility. Furthermore, the jurors' assurances were implicitly confirmed by Juror 14's note.
Our Supreme Court has stated:
[T]he trial court is in the best position to determine whether the jury has been tainted. That determination requires the trial court to consider the gravity of the extraneous information in relation to the case, the demeanor and credibility of the juror or jurors who were exposed to the extraneous information, and the overall impact of the matter on the fairness of the proceedings.
. . . .
The abuse of discretion standard of review should pertain when reviewing such determinations of a trial court. *451 Application of that standard respects the trial court's unique perspective.
[R.D., supra, 169 N.J. at 559, 781 A.2d 37.]
We find no abuse of discretion in the trial court's assessment of potential taint by blogger information or public perception of the jurors.
Defendant also argues that the trial court failed to investigate adequately evidence developed after the trial that a deliberating juror may have posted to Court TV message boards. Defense counsel discovered blog entries suggesting that a member of the jury had posted a message during the trial.[11] The judge agreed that the matter should be investigated, and the prosecutor offered to make inquiries. The judge then ruled that there was no need to re-interview jurors again at that time about the postings.
The prosecutor wrote to Court TV and requested assistance in locating the alleged post by a member of the jury. Subsequently, the prosecutor informed the court and defense counsel that Court TV had conducted a search and found "no record of the posting and no further information is available."
We must determine whether "there is a realistic possibility that information with the capacity to prejudice defendant's right to a fair trial may have reached members of [the] jury." Bey, supra, 112 N.J. at 86, 548 A.2d 846 (emphasis added); accord State v. Loftin, 191 N.J. 172, 194, 922 A.2d 1210 (2007). The "realistic possibility" has also been described as a reasonable belief by the court that the jury was exposed to prejudicial information. Bey, supra, 112 N.J. at 86, 548 A.2d 846.
Here, the blogger evidence amounted to double hearsay. The messages we have quoted in footnote 11 suggest little likelihood that a member of the jury wrote the message referenced by other bloggers but never actually discovered. Weighed against that information were the statements of jurors that they had no direct exposure to internet blogs.
Our review of the record discloses neither legal error in the procedures or standards applied by the trial court, nor abuse of discretion in its decision that exposure of jurors to extraneous information did not warrant a new trial.

VII.
Finally, defendant challenges her sentence of life imprisonment plus five years. Our review of a sentencing decision can involve three types of issues: (1) whether guidelines for sentencing established by the Legislature or by the courts *452 were violated; (2) whether the aggravating and mitigating factors found by the sentencing court were based on competent credible evidence in the record; and (3) whether the sentence was nevertheless "clearly unreasonable so as to shock the judicial conscience." State v. Roth, 95 N.J. 334, 364-66, 471 A.2d 370 (1984); accord State v. Carey, 168 N.J. 413, 430, 775 A.2d 495 (2001). We do not substitute our judgment regarding an appropriate sentence for that of the trial court. Roth, supra, 95 N.J. at 365, 471 A.2d 370.
Defendant argues that the trial judge improperly evaluated aggravating and mitigating factors. We reject without discussion defendant's contention that the court erroneously failed to find mitigating factor eleven, N.J.S.A. 2C:44-1b(11), the imprisonment of defendant would entail excessive hardship to her or her dependents. R. 2:11-3(e)(2).
Defendant also argues that the court improperly considered aggravating factor one, N.J.S.A. 2C:44-1a(1), the nature and circumstances of the offense including whether it was committed in an especially heinous, cruel, or depraved manner. Defendant contends that the trial court's finding of that factor was improperly based on conduct that occurred after the murder had been committed and on her defense strategy at trial.
In referencing desecration of the body as relevant to its finding of aggravating factor one, the court also determined not to impose a consecutive term of imprisonment for that separate crime. Moreover, the court found aggravating factor one based on the entirety of defendant's premeditated murder and cover-up of the crimes, not just desecration of the body. The court stated:
The nature and the complexity and the scope of this criminal episode involved many, many overt actions committed over a three-week period spanning four different states and reflected a willfulness and a malice that goes far beyond the elements of the crime of murder in our law.
The desecration of William McGuire's remains was particularly heinous and depraved. His body was treated as trash. It was cut and sawed apart and then packaged in garbage bags. His remains were left to decompose in the waters of another state without identification so that his family and friends might always be deprived of a dignified funeral service and burial.
The depravity of the murder was further manifested by the efforts on the part of the defendant to portray William McGuire as an abusive husband and a chronic gambler who was indebted to organized crime figures as part of her attempt to shift the blame for his murder to others. . . . [D]uring the course of the trial there was simply no credible evidence to suggest that this characterization of Mr. McGuire was in any way accurate. But perhaps most tragically the murder of William McGuire and the attack on his character has surely caused grave harm to his children. They must now grow up without a mother or father and their memories of both will be distorted and confused by the web of deception created by the defendant.
The depravity of this murder simply shocks the conscience of the court.
The reference to defendant's negative portrayal of Bill did not mean arguments made by counsel in defense of the indictment; it meant defendant's words and conduct in the days and months after Bill disappeared and before she had been charged.
Because of the level of premeditation, planning, and concealment demonstrated by the evidence, the court viewed the entirety of defendant's actions as a continuous *453 episode of purposeful, depraved, and cruel conduct. The court observed that the crimes were the result of a cold, calculated plan carried out with shocking attention to detail and callous disregard for the life of a human being and for the welfare of defendant's own children.
Trial judges are given wide discretion in imposing sentence. State v. Bieniek, 200 N.J. 601, 607-08, 985 A.2d 1251 (2010). Our standard of review is "one of great deference and `judges who exercise discretion and comply with the principles of sentencing remain free from the fear of second guessing.'" State v. Dalziel, 182 N.J. 494, 501, 867 A.2d 1167 (2005) (quoting State v. Megargel, 143 N.J. 484, 494, 673 A.2d 259 (1996)).
The trial court did not abuse its discretion in finding aggravating factor one as explained by the trial judge.
Affirmed.
NOTES
[1] A tape recording of defendant's testimony before the Middlesex County judge was admitted in evidence and played for the jury. This testimony was the basis for defendant's conviction on a charge of perjury.
[2] The toxicology examination did not reveal chloral hydrate, but there was no specific attempt to find that drug. According to the Virginia medical examiner, a normal toxicology examination seeks evidence of more common substances, such as alcohol, cocaine, and opiates. By the time the prescription of chloral hydrate was found in Bill's car, it was too late to examine Bill's body again or preserved blood samples for evidence of that drug.
[3] Addressing whether Dr. Miller could have been defendant's accomplice, the prosecution presented testimony and records from the Morristown medical practice showing that he was on duty for long hours and saw many patients during the days from April 28 to May 2, 2004. In addition, an alibi-type witness testified that she and her husband were visiting from out of state and stayed with Dr. Miller and his wife during that time period.
[4] The handwritten notes said:

Set Her Up
1-Deny that we know about firearm or that he made her get one.
2-Deny that he used to move her car when they fought sometimes.
3-Call prosecutors ... re, Mafia allegations to implicate her family.
DYFS-Adoption yields stipend for adoption through division.
4-Secondary beneficiary on his state life insurance.
5-Have kids say they saw her do it or dispose of the body.
. . . .
Final Stages
Bring bullets if no need to plant at her dad's.
Indictment.
Termination of her parental rights. Public statement against prosecution if
no indictment of her family.
Speak to publisher ... re, story rights.
Estate for boys.
Taunt her with not seeing kids and we are their parents.
[5] As previously stated, defendant was acquitted of the charges arising from the anonymous communications.
[6] Similarly to its ruling on Marcie Paulk's proposed testimony, the trial court rejected the prosecution's attempts to present evidence before the jury of the circumstances of Bill's conviction  that it was for a non-violent third-degree crime committed years earlier.
[7] Defendant claims that the trial judge discouraged objections during closing arguments. To preserve a proper record, a trial judge should not admonish counsel against making appropriate objections, but the record in this case does not contain any such prohibition. Even if defendant's claim is accurate, defense counsel also did not raise objections or ask for curative instructions at the end of the prosecutor's summation. The absence of objections was undoubtedly not due to the defense team's timidity or inattention. Experienced counsel raised many objections and argued in many sidebar conferences during the trial, and they prevailed on numerous rulings of the trial court. As an example of counsel's vigorous and diligent defense efforts, counsel presented a long list of objections and points of error at the end of the court's final instructions to the jury.
[8] We reject without discussion defendant's argument that the prosecutor's opening statement was prejudicial because it incorrectly told the jury ballistics evidence would prove that the "make and model" of the murder weapon was the same as the gun purchased by defendant. R. 2:11-3(e)(2).
[9] After the trial, defense counsel discovered a blog written on March 29, 2007, stating: "There is a female juror who has very hard eyes. She cuts them much like MM [defendant] does. This morning she is staring at MM. I have been really looking at her, she intrigues me."
[10] The judge appropriately allayed the jurors' concerns during the voir dire.
[11] According to the defense, on April 20, 2007, which was during deliberations, the following message appeared on the Court TV message boards:

Now, as to the questioning the jurors, you kno [sic] that earlier today on another thread there was a person posting who was probably joking but implying that they were a juror. The thread was titled something like "to all the jurors reading this" . . . I am sure it was a joke. That thread is gone now.
This post generated further comments. Another blogger wrote:
I read the thread earlier. . . . It was titled something like "To all the jurors who are reading this . . . ." then the post said something like, wait to make a decision on Monday because I have to work today . . . There were a few laughs and a few skip work responses . . . nothing really to try to influence a jury. So, I don't think the issue with the court is about the thread here.
Later, yet another blogger wrote:
It was here last night. Somebody posted "to all the jurors illegally reading this board" please come back with the verdict on Friday etc. etc. Somebody with very few posts responded back something like "ok, and we are leaning toward guilty."